BULLDOG CONCRETE FORMS SALES CORP. v. TAYLOR.

No. 10516.

United States Court of Appeals
Seventh Circuit.

March 31, 1952.

---

Joseph P. Miller, James E. Keating, South Bend, Ind., for appellants.

Richard F. Watt, Bernard Weissbourd, Chicago, Ill., for appellee.

Before KERNER, DUFFY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from a judgment for a deficiency after retaking and resale by the seller's assignee of property sold to the defendants on an Indiana conditional sales contract. 94 F.Supp. 328. The plaintiff, Bulldog Concrete Forms Sales Corporation, is an Illinois corporation with its principal place of business in Chicago. The contract in suit was assigned to the plaintiff by Bulldog Concrete Forms, Inc., a New York corporation, from which the defendants, William C. Taylor, Robert L. Taylor and Perry Weddell, partners, doing business as Taylor Bros. purchased the property which consisted of steel forms for use in the construction of concrete basements and foundations. Bulldog of New York is the manufacturer of the forms while Bulldog of Chicago is the sales agency. The defendants were residents of Indiana and had their principal place of business in South Bend, Indiana.

In February 1948 the defendants had a subcontract to construct concrete basements or foundations for a large number of housing units on a housing project which was being built near South Bend. During that month William L. Taylor first saw samples of these steel forms at a show in Chicago and a salesman of the plaintiff explained their use to him. On or about April 9, 1948, the defendants rented the steel forms here in question from Bulldog of New York and continued to use them on a rental basis until June 10th when they, by William C. Taylor, one of the partners, executed a conditional sales contract to purchase the forms for a total price of $12,782.95. On this amount the defendants were credited with $1,900.00 which they had paid as rental on the forms and with an additional $500.00 which they paid at that time: This left a balance of $10,882.95, which the contract made payable in ten equal instalments of $1,088.30. The defendants defaulted on the first payment, due July 15, 1948. The conditional sales contract expressly provided that the defendants agreed that, in case the vendor, on default of the

vendee, retook possession of the property and sold it, the vendees, the defendants, would pay any balance which was not satisfied from the proceeds of the sale.

Prior to the execution of the purchase contract the defendants used these steel forms in the construction of 32 basements. William C. Taylor testified that from the use of the forms, prior to the execution of the purchase agreement, the defendants found that the forms were unsatisfactory and that the defendants' superintendent thought that it would be better to bore holes in the forms so that they could be bolted together to prevent their spreading. Victor Ludwig, the president of the plaintiff company, refused to permit the partners to do this unless they purchased the forms. The partners then executed the contract of purchase, bored the holes in the forms and continued to use the forms in the construction of 38 more basements.

According to the testimony of Taylor the use of these steel forms was still unsatisfactory and the defendants, therefore, returned to the use of plywood forms. Taylor testified that erecting and dismantling the steel forms for each basement cost them approximately $250.00, as compared with a cost of $59.00 when the plywood forms were used; that when they used the steel forms they were able to construct not more than 3 or 4 basements a week while their contract called for 10 basements per week; and that, finally, even after the forms were bolted together, they spread to such an extent that the foundations did not meet the specifications for the houses that were to be erected on them.

Throughout the period during which the defendants were using the steel forms different agents of the plaintiff, including Ludwig, came to South Bend and conferred with and advised the defendants on the problem of using these forms.

In the last week of July, after the defendants had failed to meet the July 15th payment on the contract, Mr. Ludwig, acting for the plaintiff, went out to the housing project near South Bend and told Taylor that the plaintiff would have to have some money on the contract or the forms. The defendants were not then using the forms and Taylor told Ludwig that if he wanted to, Ludwig could take the forms and get them on their way to New York. Ludwig replied that Taylor didn't need to send the forms back to New York, that they could be delivered by Taylor to the company's warehouse in Chicago. Taylor agreed to this and did deliver the forms, on the partners' truck, to the plaintiff's warehouse in Chicago on August 3 and August 5, 1948. On August 10, 1948, Bulldog of New York assigned the conditional sales contract to the plaintiff.

On August 18th the plaintiff, by registered mail, informed the defendants of plaintiff's intention to sell the forms, pursuant to the provisions of the Indiana Conditional Sales Act, at a public sale to be held August 30, 1948, at 2:00 P.M., and that the defendants would be held responsible for any deficiency. The first letter failed to name the place where the sale would be held. In a registered letter, dated August 20th, the defendants were informed that the sale would be held in Room 900, 33 North La Salle Street, Chicago. Room 900 was the designation of a suite of law offices which included the law office of Milton T. Raynor who was then acting as the attorney for the plaintiff. Both of these letters were addressed to "Mr. William C. Taylor, c/o Taylor Brothers, 3535 E. McKinley Road, South Bend, Indiana," and both letters were signed by Milton T. Raynor, who stated in the first letter that he had been retained by Bulldog Concrete Forms, Inc., to take the necessary legal steps to enforce the conditional sales contract.

On August 25th the plaintiff caused notice of the sale to be published in the Chicago Daily Law Bulletin, a newspaper published in Chicago, Illinois, and copies of the notice to be posted in three places in Chicago, to-wit, the bulletin board of the Chicago Daily Law Bulletin, 34 North La Salle Street, Chicago, at the Randolph Street entrance of the County Building, and at the Washington Street entrance of the City Hall in Chicago. This notice so posted and published was as follows:

"Public Sale

Public Notice Is Hereby Given pursuant to the Indiana Conditional Sales Act, that certain steel concrete forms retaken under a conditional sales agreement and used in the construction of houses, will be sold at public auction to the highest bidder, at the office of Milton T. Raynor, 33 N. La Salle Street, Room 900, Monday, August 30, 1948, at 2:00 P. M.

The concrete forms may be inspected at the Duro-Industries Warehouse, 502 S. Canal Street, at any time prior to the sale.
August 25, 1948.

Milton T. Raynor
Attorney Aug—25."

Pursuant to the notices, the sale was held at the appointed hour and place—in Mr. Raynor's office. The receptionist in the outer office of the suite was advised of the sale and was instructed that any persons coming for the sale were to be shown into Mr. Raynor's office. The only bidder who appeared at the sale was Mr. Ludwig, representing the plaintiff. While the sale was being held only Ludwig, Raynor and Raynor's assistant and secretary were in his office. Ludwig's bid of $4,800.00 on behalf of the plaintiff was the only bid. It was accepted and the defendants' account with plaintiff was credited with that amount.

In attacking the validity of the judgment for the deficiency owing after the resale, the defendants rely principally on various alleged defects in the steps taken by the plaintiff in the giving of notice of and in the conduct of the resale. Section 18 of the Indiana Conditional Sales Act, Burns' Indiana Statutes (1951 Replacement), § 58–818, provides that if the buyer has paid less than fifty per cent of the purchase price of the goods retaken by the seller, the seller may voluntarily resell the goods for the account of the buyer on compliance with the requirements set out in § 17 of the Act. Burns' Indiana Statutes (1951 Replacement), § 58–817, includes the following requirements: " * * * The seller shall give to the buyer not less than ten [10] days' written notice of the sale, either personally or by registered mail, directed to the buyer at his last known place of business or residence. The seller shall also give notice of the sale by at least three [3] notices posted in different public places within the filing district [county] where the goods are to be sold, at least five [5] days before the sale. If at the time of the retaking five hundred dollars [$500] or more has been paid on the purchase-price, the seller shall also give notice of the sale at least five [5] days before the sale by publication in a newspaper published or having a general circulation within the county where the goods are to be sold. * * *" This same section of the Act also expressly provides that the seller may bid for the goods at the resale.

█ The defendants first contend that since the notices of the sale sent by the plaintiff were addressed to William C. Taylor, c/o Taylor Brothers, at the business address of the partnership in South Bend, Indiana, these letters, so addressed, did not constitute ten days' written notice of the proposed sale to Robert L. Taylor and Perry Weddell, the other two partners. We find an Indiana statute, the Indiana Uniform Partnership Act, Burns' Indiana Statutes (1951 Replacement), § 50–412, which expressly provides that: "Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner."

Under the express terms of this Indiana statute the written notice to William C. Taylor was notice to the other two partners.

█ The defendants also insist that, to comply with the act, the notice to the buyers should have been given by the "seller." The seller named in the conditional sales contract was Bulldog of New York. But, after the default of the buyers, Bulldog of New York assigned the contract to the plaintiff, Bulldog of Chicago, which was the sales and service agent of the New York corporation. When the contract was

assigned to the plaintiff this company acquired the rights and assumed the obligations of the original seller, including the obligation to notify the buyers of the resale of the property. The fact that the letter of notification was signed by the attorney is not material. In so doing he was acting as the attorney for and agent of the plaintiff. His act was the act of the plaintiff. The notice was by the "seller" within the meaning of the Act.

█ The defendants also contend that the Chicago Daily Law Bulletin was not such a "newspaper" for the publication of the notice as to satisfy the requirements of the Indiana Conditional Sales Act. This court held in Re Sterling Cleaners & Dyers, 7 Cir., 81 F.2d 596, that the Chicago Daily Law Bulletin was a proper newspaper in which to publish notices and orders in bankruptcy matters. Among the authorities relied on in that decision was Lynn v. Allen, 145 Ind. 584, 44 N.E. 646, 33 L.R.A. 779, a case involving "a publication in all respects very similar to the Chicago Daily Law Bulletin" [81 F.2d 598]. The Indiana court held that the newspaper there being considered was a proper newspaper for the publication of the legal notice there in question. The Chicago Daily Law Bulletin is "a newspaper published * * * within the county where the goods are to be sold." The Law Bulletin is published in the City of Chicago daily except Sunday and it carries various items of general interest as well as court dockets and news. It also carries many legal notices and advertisements. It is to be noted that the statute we are here considering specifies that the notice shall be published in "a newspaper published *or* having a general circulation within the county where the goods are to be sold." (Our emphasis.)

█ The Chicago Law Bulletin certainly met the requirements of the statute as being a newspaper published in the county where the goods were to be sold, but the defendants say that Burns' Indiana Statutes (1951 Replacement), § 49–710, states that in all cases where the law provides for the publication of legal notices in any newspaper it shall be unlawful for any public official or other person to make such newspaper publication in any manner except by publication in a newspaper "entered, authorized and accepted by the post-office department of the United States of America as mailable matter of the second class and conforming to the requirements of mailable matter of the second class as defined by the act of congress of the United States of March 3, 1879 [39 U.S.C.A. § 224 et seq.]." In this case there was no showing made that the Chicago Daily Law Bulletin is a publication entered, authorized and accepted by the Post Office Department as mailable matter of the second class and conforming to the requirements of mailable matter of the second class as defined by Congress. An examination of this Indiana statute on the publication of legal notices, cited by the defendants, reveals that it is a penal statute which declares that any person violating it shall be deemed guilty of a misdemeanor and, upon conviction, shall be fined. The defendants assume that this statute is applicable to notices filed in Illinois by an Illinois corporation. Since the statute is only a penal statute, however, it cannot be held to invalidate publication of notices outside of Indiana, even though the notices are given pursuant to the requirements of an Indiana statute on an Indiana contract. Bowles v. Heckman, 224 Ind. 46, 50, 64 N.E.2d 660, 662; Cruthers v. State, 161 Ind. 139, 67 N.E. 930; Rogers v. Western Union Telegraph Co., 122 Ind. 395, 24 N.E. 157.

█ The defendants contend that the notice of sale here in question, which was published in the Chicago Daily Law Bulletin in the afternoon of August 25th, advertising the sale to be held at 2:00 P. M. on August 30th, was not published "at least five (5) days before the sale." Defendants say that this notice was published only 117 hours before the sale, whereas the statute required notice of five full days of the 24 hours each, or 120 hours. Burns' Indiana Statutes (1946 Replacement), § 2–4704, provides that the requirement for figuring the time for legal action shall be arrived at by excluding the first day and including the last. This is the standard rule for computing time in most jurisdictions. In Keeling v. Board of Zoning Ap-

peals, 117 Ind.App. 314, 69 N.E.2d 611 (Transfer denied 1947), this rule was applied to a rule of procedure which required that notice be given "at least five days before the date of hearing." In that case the parties also contended that the time given was short by only a few hours.

 The defendants also insist that the sale notices were not posted in three different public places. On this point they argue that the County Building and the City Hall being under one roof, constitute only one building and, therefore, only one "public place." Defendants rely on a decision of the Supreme Court of Illinois. McDaniel v. Wetzel, 264 Ill. 212, 106 N.E. 209, L.R.A. 1916E, 1140, which held that posting of the required three notices at three different doors of the same court house was not sufficient. That case presented an entirely different picture from the one here confronting us. Here the locations of the notices were separated by a full city block—the one notice posted at the entrance of the City Hall, the other at the entrance of the County Building. The fact that both were under one roof and that there were some interconnecting corridors and other common facilities did not prevent the entrances used for posting the notices from being two public places. The defendants contend that the bulletin board at the Chicago Daily Law Bulletin did not constitute a public place because it was "only notice to one-half of the public." They base this contention on the assertion that the bulletin was not as easily seen by people walking in one direction as by those walking in the other direction. This board was visible to pedestrians using the sidewalk in front of 34 North La Salle Street, one of the busiest places in downtown Chicago. The board is regularly used for posting various public notices. There can be no question but what this also constituted a "public place" within the meaning of the Act.

 Defendants also object to the description in the notices of the place of the resale. As shown by the copy of the notice set out above, the place for the resale was described as the office of Milton T. Raynor, 33 North La Salle Street, Room 900, and the notice also gave 502 South Canal Street as the address where the property could be inspected. The District Court, we think properly, found that the omission of the city and state from the address in this notice was not a fatal defect; that, considering the fact that the paper was published in Chicago, a person of average intelligence would understand that the address given was an address in Chicago, Illinois. A sufficient notice would necessarily include such a description of the place as the ordinary person would understand. We think the notice here met that requirement. The defendants rely on United States v. Jones, 7 Cir., 174 F.2d 746, which held that in a trial in the United States District Court for the Northern District of Illinois, the Government failed to prove venue in a narcotics case although the Government proved that the acts constituting the crime charged were committed on certain streets without identifying the city in which the streets were located. The standards of proof in a criminal prosecution cannot serve as a guide in determining what constitutes compliance with the requirements of this Act on notice of sale.

 The defendants insist that the description of the property in the published and posted notices to the public was so inadequate as to invalidate the sale. They say, relying on Simonds v. Buford, 18 Ind. 176, that such notice should, in addition to a description of the property, state the amount owing, to whom, by whom and for what, as well as tell where the property would be sold, who was selling the property and the uses to which the property could be put. The Indiana case cited by the defendants was speaking of a notice of intention to hold a lien on real estate for materials furnished. Such a notice serves an entirely different purpose than the purpose of the notice which we are considering. The mechanic's lien notice is to the owner of the real estate and to only such members of the public as might be dealing with the real estate. To such persons an accurate description of the real estate, the amount of the lien, the name of the person claiming the lien, are all important. The notice with which we are here con-

cerned is to all persons who might be interested in the purchase of the property offered for sale. The prospective bidders are not interested in the amount due on the conditional sales contract, nor in the identity of the debtor or of the person conducting the sale. While the Act provides no particular form of notice, the notice should, of course, give a sufficient description of the property to inform prospective bidders in a general way whether or not the property is anything in which they might be interested. In the notices here in question the property was described as "steel concrete forms retaken under a conditional sales agreement and used in the construction of houses." The notices informed the public that the forms might be inspected and gave the address of the warehouse in which they were stored. While this cannot be said to be a detailed description of the property to be sold, we think it sufficient under the circumstances of this case. The defendants say that this description did not tell whether the forms were made of steel or of concrete, but there can be no doubt but what the ordinary person reading the notice would understand that they were steel forms for use in concrete construction work. It would seem that the only persons who would be interested in buying such forms would be contractors engaged in concrete construction. To such persons we may assume that the description would tell them that the forms were to be used in the erection of concrete walls. We think this would be sufficient information to cause the ordinary person interested to investigate by contacting the attorney or by going out to the warehouse and inspecting the forms. The description of the property, in our opinion, was sufficient under the Indiana Act.

Defendants now contend that the resale of these forms should have been held in Indiana rather than in Chicago; that both the original sale and the retaking occurred in Indiana. Both parties admit that the original sale took place in Indiana but the plaintiff insists that the retaking occurred in Chicago. We think this is correct. Taylor testified that Ludwig called on him in South Bend; that Ludwig demanded money on the balance due or the return of the forms; and that it was finally agreed between them that defendants, on their trucks, should return the forms to the plaintiff's warehouse in Chicago. The District Court found that the forms were returned in this manner— the first load on August 3rd and the remainder on August 5th. Ludwig testified that he had not been advised as to when the forms would be delivered in Chicago and that he was surprised when notified of their arrival. While the plaintiff retained title to the forms, the possession was in the defendants up to the time of the delivery in Chicago. The plaintiff could have taken possession in South Bend and arranged for transportation to Chicago but this was not done. At the time of Ludwig's visit to South Bend the defendants held possession under the contract. They retained that possession until they delivered the forms to the plaintiff. The defendants could have failed to take the forms to Chicago and in that manner have caused the plaintiff to sue for possession. Defendants in South Bend only told plaintiff what they were going to do. It was done in Chicago. Since the retaking took place in Chicago, the Act expressly permitted the resale there. The District Court, therefore, correctly held that the sale of the forms on August 30th was within thirty days of August 3rd and 5th, the dates the forms were delivered to the plaintiff's Chicago warehouse.

The defendants also contend that for the sale to be a "public sale," as required by § 17 of the Act, the sale must be held in a public place and that Raynor's law office was not such a public place as to satisfy the requirements of the Act. Defendants argue that this law office would not have been a proper place for the posting of a notice required to be posted in a public place and that, therefore, it could not be considered a proper place for holding a public sale. The Act here under consideration, while expressly requiring that the notice of the sale be posted in public places, says nothing about the sale being held in a public place. Defendants rely upon Dulin v. National City Bank, Ind.App., 1921, 130

N.E. 426, decided before the enactment of the Indiana Conditional Sales Act. The court there found that a sale, required under another statute to be public, was not public where the sale was held in the board of directors' room of a bank without there having been any notice of the sale to the public. The court there said, 130 N.E. at page 428: "According to the authorities, for a sale to be a 'public sale,' it must be held in a public place, a place to which the public, as such, have access."

However, in summarizing their holding in that case, the court said, 130 N.E. at page 428: "They chose to make the sale (what they called) public, but did not conform to the rules governing public sales, *so far as publicity was concerned,* and therefore the said sale was not a 'public sale' as defined by law." (Emphasis supplied.)

From this we may assume that the court would have held that, if the proper notice of the sale had been given to the public, the sale held in the board of directors' room would have constituted a valid public sale. For the validity of a "public sale" to meet the requirements of the Act, it is only necessary, so far as the place is concerned, that the sale be held in a place which is accessible to those invited to attend and to which those members of the public who may be interested are invited to come to inform themselves as to the property to be sold, and to bid thereon. Black's Law Dictionary (Third Edition) defines "public auction" as: "A sale of *property at auction, where any and all persons who choose are permitted to attend and offer bids.* * * *"

A note to this definition explains that: "Though this phrase is frequently used, it is doubtful whether the word 'public' adds anything to the force of the expression, since 'auction' itself imports publicity. If there can be such a thing as a private auction, it must be one where the property is sold to the highest bidder, but only certain persons, or a certain class of persons, are permitted to be present or to offer bids."

The notice in the instant case was an invitation to all, published as required by Indiana statute.

Defendants also complain that plaintiff was the only bidder, that no money passed hands and that only a credit was given defendants on the books of plaintiff. The Indiana Conditional Sales Act, Burns' Indiana Statutes (1951 Replacement), § 58–817, expressly gives the seller the right to bid on goods at the resale. Where, as here, the seller has given the required notice of the resale he cannot be held responsible if no other bidder appears. Section 19 of the Act expressly authorizes the seller to apply the proceeds of the sale, after payment of the expenses of retaking and the resale, to the satisfaction of the balance due on the contract. This was done here by giving the defendants credit on the balance they owed on the contract. It was not necessary for the plaintiff to hand cash to Raynor, who was conducting the sale, and then have Raynor hand the cash back to the plaintiff before the entry of the credit to defendants was made.

The defendants insist that they were entitled to credit on their account for the reasonable value of the property retaken rather than for the amount of $4,800.00 bid by the plaintiff. Ludwig, for the plaintiff, and William C. Taylor, for the defendants, were the only witnesses who testified on this subject. There was a conflict in the testimony of these two witnesses as to the reasonable value of the forms when they were returned to the plaintiff. Ludwig, who made the bid for the plaintiff, said he thought at that time that the forms were reasonably worth $4,800.00 but that he was wrong; that he later learned that he had set the value too high; that, due to the manner in which the defendants had used the forms, they were encrusted with cement more than he had at first thought and the forms were, therefore, not in as good condition as he thought. Taylor, the only other witness on this subject, said the forms were worth $11,000.00 at the time of the resale but, on cross examination, he admitted that in a deposition taken prior to the trial, he had testified under oath that $4,800.00 "was a lot more than they were worth to start with." There was a conflict in the testimony of these

two witnesses as to how the forms had been used by the defendants, as to how much concrete had been permitted to accumulate on them, and as to whether the concrete could be successfully removed from them. The District Court found that there was no evidence on which it could rely showing that $4,800.00 was an inadequate bid. Here, in addition to there being a conflict in the evidence as to the true value of the property, there was no evidence of fraud or bad faith on the part of the seller. Since the District Court here was unable to find, from the evidence, that the bid of $4,800.00 was inadequate, the rule announced in Conway v. Skidmore, 1935, 48 Wyo. 73, 41 P.2d 1049, cited by defendants is not applicable. In that case the court said that a gross inadequacy in the price bid could be considered with other irregularities in finding the sale void.

The defendants nowhere in their brief point to any prejudice to them from any of the alleged defects in the notices or in the conduct of the sale. Taylor admitted receipt of the notices to the defendants. He did not claim to have been confused by any of the "defects" in the notices now alleged by the defendants. Taylor admitted that he could have attended the sale but that he did not. In the notices published and posted and in the conduct of the resale there was at least substantial compliance with the various applicable provisions of the Indiana Conditional Sales Act. In the absence of a showing of prejudice the defendants cannot be heard to complain.

Finally, defendants assert that there was a breach of an implied warranty by the seller in this case in that the forms were not usable for the purpose for which they were purchased. The defendants insist that this situation fits within the provisions of the first two paragraphs of § 15 of the Indiana Uniform Sales Act, Burns' Indiana Statutes (1951 Replacement), § 58–115. Those two paragraphs are as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment * * * there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description * * * there is an implied warranty that the goods shall be of merchantable quality."

Defendants argue that although they had used the forms for approximately two months before they bought them, all that was then clear was that the forms would not work with the ties furnished by the manufacturer. The defendants' foreman thought that the forms would be more apt to work if they were fastened together by bolts instead of the ties which came with them. Fastening the forms together with bolts necessitated the boring of holes in the forms and the plaintiff would not permit this unless the defendants bought the forms. The defendants, therefore, bought the forms, bored the holes, and tried fastening them together with bolts and found that they still would not work.

The situation presented in this case is a far cry from the situations described in Paragraphs (1) and (2) of the Indiana Uniform Sales Act. The defendants here were experienced contractors engaged in concrete construction. Taylor testified that the different men sent out by the plaintiff in an attempt to help the defendants in the use of the forms did not know as much about their use as he (Taylor) knew. It seems quite evident that the defendants here, when they purchased the forms, were not relying on the skill and judgment of the seller as provided in § 58–115(1). It is equally clear that the defendants' situation did not fall within § 58–115(2) of the Act. In this case the goods certainly could not be considered as having been bought by description after the defendants had used the forms for approximately two months and had constructed basements for more than 30 houses with them.

Instead, the defendants' situation fits perfectly within § 58–115(3) which provides that: "(3) If the buyer has examined the goods, there is no implied

428

warranty as regards defects which such examination ought to have revealed."

The defendants here had been examining and using the forms for two months. They freely admit that they found in these forms the defects of which they are now complaining. They thought that the defects could be overcome by boring holes in the forms and bolting them together. Ludwig insisted that before the defendants mutilated the forms in that manner defendants should sign a conditional sales contract for the purchase of the forms. This should have indicated to the defendants that the plaintiff did not know whether bolting the forms together would make them usable or not. At that point the defendants could have turned the forms back to the plaintiff and have been under no further liability. Instead defendants chose to contract to buy the forms in order that they might try their experiment with them. The experiment failed. It was then too late for them to shift the liability over to the plaintiff on the theory of an implied warranty by the plaintiff.

The judgment of the District Court is affirmed.